Mary SROKA–CALVERT, Personal Representative of the Estate of Emily P. Garman, Deceased, Appellant/Cross–Appellee,

v.

David S. WATKINS and Ancel A. Rush, Co–Executorsof the Estate of Jennings B. Garman; Mary L. Harrod, Roberta G. Jarrell; John R. Harrod; Thomas G. Jarrell, and Barbara G. Jarrell, Appellees/Cross–Appellants.

Nos. 96–CA–1949–MR (Direct–Appeal), 96–CA–2123–MR (Cross–Appeal).

Court of Appeals of Kentucky.

April 10, 1998.

Patrick A. Ross, Horse Cave, for Appellant/Cross–Appellee.

W. Currie Milliken, Bowling Green, for Appellees/Cross–Appellants Watkins and Rush.

Theodore H. Amshoff, Jr., Louisville, Charles E. English, Bowling Green, for Appellees/Cross–Appellants Mary and John Harrod, And Roberta, Thomas, and Barbara Jarrell.

Before BUCKINGHAM, KNOPF and SCHRODER, JJ.

## OPINION

BUCKINGHAM, Judge.

Appellant Mary Sroka–Calvert[1], administrator with the will annexed of the estate of Emily P. Garman (Mrs. Garman), appeals from a judgment on a directed verdict of the Warren Circuit Court in favor of Appellees David S. Watkins (Watkins) and Ancel A. Rush (Rush), co-executors of the estate of Jennings B. Garman (Mr. Garman), and the heirs of Mr. Garman.[2] The heirs of Mr.

---

1. Originally, the appellant in this case was Thomas Buford Pemberton, the administrator of Mrs. Garman's estate. However, Mr. Pemberton died while this appeal was pending, and Mary Sroka–Calvert, the new administrator of Mrs. Garman's estate, has been substituted as a party in Mr. Pemberton's place.

2. These heirs are Mary L. Harrod, Roberta G. Jarrell, John R. Harrod, Barbara G. Jarrell, and Thomas G. Jarrell.

Garman cross-appeal from the judgment on a directed verdict that was adverse to them on their counterclaim. For the reasons set forth fully hereinafter, we affirm in part and reverse in part and remand the case for a new trial.

Mr. and Mrs. Garman were married in the early 1950's and remained married for more than forty years until their respective deaths. Mr. Garman worked as a rural mail carrier, and Mrs. Garman worked in a bank during their years together. No children were born of their marriage, and at the end of their lives, they had accumulated more than one million dollars in financial assets as well as three parcels of real estate. Most of their financial assets consisted of stocks and bonds held through a joint brokerage account at J.J.B. Hilliard, W.L. Lyons, Inc. (Hilliard Lyons), which alone had a value on the date of Mr. Garman's death of nearly one million dollars. Other financial assets were held by Mr. and Mrs. Garman in a joint brokerage account with Merrill Lynch, Pierce, Fenner and Smith, Inc. (Merrill Lynch).

In 1987, with the assistance of the couple's attorney, Currie Milliken (Milliken), Mrs. Garman executed a will leaving all of her property, except for certain specific bequests, to Mr. Garman. She refused to include a residuary clause in her will, and there is no allegation that she was mentally incompetent to execute her will at that time. However, Mrs. Garman suffered a stroke in 1989 which left her physically disabled and, arguably, mentally disabled.

In early October 1993, Mr. Garman discovered that he had cancer and probably did not have long to live. He went to see Milliken to put his affairs in order, unaccompanied by Mrs. Garman. After ascertaining the value of the couple's assets, Milliken called in a certified public accountant, Joe Taylor (Taylor), for assistance in devising an estate plan for the Garmans. Although such a plan may not have been the wisest in terms of estate tax consequences, Mr. Garman expressed a desire to take all of the assets in the couple's joint brokerage accounts and put them into his sole name. Upon his death, Mrs. Garman was to take a life estate in all of these assets in a trust to be administered by Watkins and Rush. Upon her death, any remaining assets would then pass to Mr. Garman's heirs.

Mr. Garman had Milliken prepare a will setting forth his above stated desires, naming Watkins and Rush as co-executors, and began taking steps to transfer title to the couple's stocks and bonds into his sole name. The couple's stock broker at Hilliard Lyons, Mike Jennings (Jennings), prepared a relinquishment letter for Mr. and Mrs. Garman to sign and also obtained twenty-eight stock powers for the couple to sign to effectuate the transfer of the financial assets in the Hilliard Lyons brokerage account to Mr. Garman's sole name. The purported signatures of both Mr. and Mrs. Garman appear on these documents, although Mrs. Garman's estate alleges that her signature was forged on each of them. Paperwork was also completed to transfer the financial assets in the Merrill Lynch joint brokerage account to a joint brokerage account with Hilliard Lyons. However, the assets were never transferred into Mr. Garman's sole name. As these assets were held by Mr. and Mrs. Garman jointly with the right of survivorship at the time of Mr. Garman's death, they passed at that time to Mrs. Garman and then to her heirs at her death.

On October 13, 1993, Mr. Garman was admitted to the hospital. On October 14, pursuant to Mr. Garman's wishes, Watkins and Rush filed petitions in the Warren District Court to have Mrs. Garman adjudged disabled and to be appointed her emergency guardians during Mr. Garman's hospitalization. The Warren District Court appointed Watkins and Rush as emergency guardians that same day and also entered an order appointing an interdisciplinary team to examine Mrs. Garman and determine if she was disabled from taking care of or managing her personal affairs and her finances.

Also on October 14, Mr. Garman had Milliken to prepare a codicil to his will to leave certain items of personal property to Watkins and Rush. In early November, Mr. Garman had Milliken prepare a second codicil to his will in which he left all of his furniture and personal belongings located in the couple's residence to Watkins and Rush. Mr. Garman died on November 10, 1993, and

Watkins and Rush were appointed co-executors of his estate and trustees of Mrs. Garman's life estate. They allowed Mrs. Garman to use all of the personal property and furniture in the Garman residence during her lifetime, but they claimed entitlement to the property after her death as property passing to them under the second codicil to Mr. Garman's will.

In late November and early December 1993, social worker Lee Ann Austin (Austin) and psychologist Madelene Chandler (Chandler) interviewed Mrs. Garman as part of the disability proceeding and submitted reports to the Warren District Court. Austin found Mrs. Garman to be somewhat confused and disoriented, and Chandler determined that Mrs. Garman was suffering from dependent personality disorder, meaning that she was unable to disagree with others or make life decisions. Chandler found Mrs. Garman to be functioning at the adaptive behavior level of a two-year-old child. Both Austin and Chandler recommended that a guardian be appointed for Mrs. Garman to handle her personal and financial affairs. On December 8, 1993, a jury found that Mrs. Garman was wholly disabled and incapable of managing her personal affairs and financial resources. The trial court entered a judgment consistent with the jury's verdict,[3] and Watkins and Rush were appointed as guardians for Mrs. Garman.

Watkins and Rush arranged for Mrs. Garman's care until she died on April 28, 1995. A few weeks after her death, Milliken notified Mrs. Garman's heirs (first cousin Thomas Buford Pemberton and second cousin Mary Sroka–Calvert) of Mrs. Garman's death, of the fact that they stood to inherit some property held in her name, and of Milliken's intention to have Watkins and Rush named co-executors of Mrs. Garman's estate. Pemberton obtained counsel and was appointed administrator with the will annexed of Mrs. Garman's estate by the Warren District Court. As administrator, Pemberton later brought suit on behalf of Mrs. Garman's estate against Mr. Garman's

estate to recover certain property, including the financial assets that had previously been held in the Hilliard Lyons joint brokerage account. Mr. Garman's heirs filed a counterclaim seeking to reform the documents evidencing ownership of the Merrill Lynch financial assets to reflect sole ownership in Mr. Garman's name as they alleged was Mr. and Mrs. Garman's intent.

A jury trial was commenced, but the trial court entered directed verdicts on all issues following the presentation of evidence on behalf of Mrs. Garman's estate. In essence, the trial court held in favor of Mr. Garman's estate that the terms of the brokerage account agreements with Hilliard Lyons allowed Mr. Garman or Mrs. Garman to make transfers without the consent of the other and, specifically, that Mr. Garman had the authority to transfer jointly owned financial assets in the Hilliard Lyons brokerage account to his sole name without Mrs. Garman's consent. The trial court also held that Mrs. Garman's estate failed to introduce evidence that Mrs. Garman did not sign the relinquishment letter and the stock powers and that there was insufficient evidence of Mrs. Garman's mental incapacity to execute the documents. Furthermore, the trial court held that Mrs. Garman's estate failed to introduce proof regarding ownership of the personal property and furniture located in the marital residence and thus determined that it was property belonging to Mr. Garman at the time of his death. Mrs. Garman's estate appealed from the judgment based on this directed verdict.

Finally, the trial court entered a separate order and judgment holding that the jointly owned financial assets from the Merrill Lynch brokerage account had never been transferred to Mr. Garman's sole name at the time of his death and that they remained jointly owned property which passed to Mrs. Garman when Mr. Garman died. Mr. Garman's heirs cross-appeal from that judgment.

■ The primary argument of Mrs. Garman's estate concerns the main thrust of the trial court's directed verdict, which is that

---

**3.** The trial court did not allow Mrs. Garman's estate to introduce this judgment in the case sub judice, so it was put in the record by avowal.

the terms of the Hilliard Lyons brokerage agreement allowed Mr. Garman to change the ownership of the jointly held financial assets to his sole name without the consent of Mrs. Garman. The trial court relies on the language of the Hilliard Lyons brokerage account agreement which provides:

> The undersigned jointly and severally agree that **each of them shall have the authority** on behalf of the joint account to buy, sell (including short sales) and otherwise deal in, through you as brokers, stocks, bonds and other securities and commodities, on margin or otherwise; to receive on behalf of the joint account demands, notices, confirmations, reports, statements of account and communications of every kind ... and generally to deal with you on behalf of the joint account as fully and completely as if he alone were interested in said account, **all without notice to the other or others interested in said account.**

(Emphasis added.) Relying on *Bealert v. Mitchell*, Ky.App., 585 S.W.2d 417 (1979), the trial court interpreted this language to allow either of the Garmans to transfer assets held in the joint brokerage account in joint ownership into his or her sole name without the consent of the other. In *Bealert*, the husband removed his wife's name from their joint savings account. The trial court determined and this court agreed that the wife had consented to the complete withdrawal of funds from the account and thus also consented to the removal of her name as well. *Id.* at 417–18. There were signed signature cards in the *Bealert* case which indicated that the financial institution must pay funds from the joint account pursuant to the instructions of only one of the joint owners without liability to the other.

The case sub judice is distinguishable from *Bealert* in that the brokerage account agreement here does not allow the transfer of jointly held financial assets by one party into his or her name without the consent of the other party. The provision of the agreement in question merely allows each owner of the joint account to buy or sell stocks, bonds, or other financial assets and to otherwise deal with Hilliard Lyons on incidental matters

without advising the other joint owner. There is nothing in the agreement authorizing one owner of the joint account to transfer any financial asset held in the account to his or her sole name. Furthermore, as the Hilliard Lyons stock broker testified, such a transfer could not be accomplished without both owners signing a relinquishment letter and stock powers for each of the securities. The trial court's reliance on the *Bealert* case is misplaced, as there was a written consent therein.

We also conclude that *Hensley v. Ball*, Ky., 380 S.W.2d 279 (1964), is applicable. In that case, the decedent amassed a small fortune, much of which consisted of stocks for which he placed ownership on the stock certificates in the names of his children or, in some cases, in the names of him *or* his children. The appellate court reversed the trial court's determination that these assets belonged to the estate and held that the stocks were owned by the child or children named on the stock certificates. The court held that "[s]tock certificates ... [are] evidence of contract rights held by the owner or payee against the signatory institution or party.... [The owner] is vested with the rights evidenced by the instrument, which is no less a contract simply because it may generally and more familiarly be regarded as a title document." *Id.* at 283. We conclude that Mr. Garman could not transfer the financial assets without Mrs. Garman's consent and signature and that the brokerage account agreement did not give him that right.

■ It logically follows that if Mr. Garman could not transfer the assets without Mrs. Garman's consent and signature, then the questions remain as to whether the trial court correctly determined that Mrs. Garman's estate failed to introduce sufficient evidence that Mrs. Garman's signatures were forged and that, even if the signatures were Mrs. Garman's, she lacked the mental capacity to execute the documents. In ruling on a motion for a directed verdict,

> a trial court is under a duty to consider the evidence in the strongest possible light in favor of the party opposing the motion. Furthermore, it is required to give the opposing party the advantage of every fair

and reasonable inference which can be drawn from the evidence. And, it is precluded from entering either a directed verdict or a judgment n.o.v. unless there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable men could differ.

*Taylor v. Kennedy,* Ky.App., 700 S.W.2d 415, 416 (1985). Having examined the evidence presented at trial, we conclude that the trial court erred in determining that Mrs. Garman's estate introduced insufficient evidence on these issues to overcome the directed verdict motion.

Concerning Mrs. Garman's mental capacity to execute the stock transfer documents, there was testimony that Watkins and Rush filed a disability petition in the Warren District Court within two days after she allegedly executed the documents. The testimony of Austin and Chandler, both of whom evaluated Mrs. Garman within weeks after the filing of the petition, was that Mrs. Garman was experiencing significant mental difficulties. Even Watkins and Rush testified that Mrs. Garman's mental condition did not change significantly between October and December 1993, when Mrs. Garman was found to be disabled by a jury of the Warren District Court. We find that the evidence was sufficient to overcome the directed verdict motion and that Mrs. Garman's mental capacity to execute the documents was a question for the jury's determination.[4]

■ We likewise find that the trial court erred in determining that Mrs. Garman's estate failed to introduce sufficient evidence to overcome a directed verdict motion on the issue of whether her signatures to the stock transfer documents were forged. S.A. Slyter (Slyter), a handwriting expert, testified that in his opinion the alleged signatures of Mrs. Garman on the relinquishment letter and the stock powers were not genuine. However, he testified that these signatures matched other purported signatures of Mrs. Garman on two deeds which had been duly notarized by Steve Gilley (Gilley). Gilley testified that Mrs. Garman had signed the deeds in question in his presence.

■ Mr. Garman's estate defends the trial court's action in granting a directed verdict on this issue by stating that Slyter's testimony constitutes a judicial admission. Judicial admissions upon which a directed verdict may be granted can only be made by parties, not by mere witnesses. *See* Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.15 (3d ed.1993). Also, to characterize Slyter's testimony as a "judicial admission" would not be accurate at any rate since "a judicial admission is conclusive, in that it removes the proposition in question from the field of disputed issue, and may be defined to be a formal act...." *Sutherland v. Davis,* 286 Ky. 743, 749, 151 S.W.2d 1021, 1024 (1941). As the finder of fact has the right to believe part of the evidence and disbelieve other parts, even if the evidence came from the same witness, *Caudill v. Maloney's Discount Stores,* Ky., 560 S.W.2d 15, 16 (1977), the jury could have concluded that Slyter was mistaken in his opinion that the signatures on the deed were the same as those on the transfer documents yet have accepted his opinion that Mrs. Garman did not sign the documents. The portion of Slyter's testimony in question was neither "a formal act" nor was it conclusive of the issue. We conclude that whether the signatures on the documents were Mrs. Garman's or were forgeries was a fact issue subject to determination by a jury.

Mr. Garman's estate further contends that Gilley's testimony that Mrs. Garman signed the deeds in question in his presence conclusively establishes the authenticity of her signature on the deeds. *Skaggs v. Vaughn,* Ky.App., 550 S.W.2d 574, 576 (1977); KRS 61.060. Coupled with Slyter's statement

---

4. We disagree with the arguments of Mrs. Garman's estate that the disability judgment entered by the Warren District Court in December 1993 recognized that the disability existed for six months prior to the date the petition was filed. KRS 387.150(8) provides that a finding of disability must be "evidenced by acts or occurrences within six months of the filing of the petition for guardianship or conservatorship." This simply states a requirement that disability be proven by evidence of recent acts or occurrences, and does not suggest that a finding of disability has a retroactive effect for the previous six months.

that Mrs. Garman's purported signatures on the deeds and on the stock transfer documents were made by the same person, Mr. Garman's estate argues that the authenticity of Mrs. Garman's signature on the stock transfer documents was also conclusively established by Gilley's testimony. However, Gilley's testimony could only conclusively establish the authenticity of Mrs. Garman's purported signatures on the deeds. As we have previously explained, the jury would be free to accept or reject Slyter's opinion that the signatures on the deeds and stock transfer documents were made by the same person.

■ Furthermore, it does not appear that Gilley's testimony even conclusively established the authenticity of Mrs. Garman's signature on the deeds as her estate alleged mistake on the part of Gilley in proceedings relating to a separate claim involving the deeds, which was settled. Where mistake on the part of the notary is alleged, the notary's testimony is no longer conclusive on the issue of the authenticity of a signature. *Skaggs, supra.*

■ We conclude that the trial court also erred in determining as a matter of law that the personal property and furniture in the marital residence belonged to Mr. Garman at his death since Mrs. Garman's estate did not introduce evidence of her ownership in the property. The property was located in the marital residence, which Mrs. Garman's estate claims was owned by her, and the property was apparently acquired during the marriage. As Mrs. Garman contributed funds to the marriage from her employment, we fail to perceive why the personal property and furniture should be held to be Mr. Garman's as a matter of law. According to general authority, "the common-law presumption that ownership of household goods used and possessed by both spouses was in the husband is no longer recognized." 41 Am.Jur.2d *Husband and Wife* § 25 (1995).

We recognize that the common-law presumption that the husband owned all personal property was stated in *Knox v. Trimble,* Ky., 324 S.W.2d 130 (1959). However, the *Knox* court stated that the presumption was falling into disfavor at that time. *Id.* at 131.

Furthermore, even assuming such an inequitable presumption would still apply today, we find that a valid issue of fact still exists concerning the ownership of the personal property—especially given Mrs. Garman's financial contributions due to her years of working outside the home.

■ Mr. Garman's heirs also argue that Mrs. Garman's guardians (Watkins and Rush) could have instituted an action on her behalf to renounce Mr. Garman's will and receive her statutory share had she desired to receive an interest in the personal property. This argument, however, overlooks the fact that Mrs. Garman was under a disability and perhaps unable to make that decision and that Watkins and Rush had a clear conflict of interest in taking such action on her behalf since they were beneficiaries of the property under the codicils to Mr. Garman's will. In short, we conclude that the trial court erred in directing a verdict and holding that the personal property and furniture in the residence belonged to Mr. Garman only at the time of his death.

■ Finally, concerning the cross-appeal by Mr. Garman's heirs, we find no error. Mr. Garman's estate contends that the documents evidencing ownership in the Merrill Lynch financial assets should be reformed to indicate ownership in Mr. Garman's sole name since such was the parties' intent. Mr. Garman's estate contends that only a delay in the paperwork by the Hilliard Lyons office when the assets were transferred there from Merrill Lynch prevented the transfer of the assets into Mr. Garman's sole name. The evidence indicates, however, that Mr. Garman never took any affirmative action to have the financial assets transferred to his name after they had been transferred from Merrill Lynch to a joint account with Hilliard Lyons. Jennings, the Hilliard Lyons stock broker, testified that the parties never completed the paperwork required to transfer the ownership into Mr. Garman's sole name.

■ To reform a written instrument, a trial court must find clear and convincing evidence that there was a valid agreement and that the written agreement failed to

express the intent of the parties due to a mutual mistake. *Berry v. Crisp*, Ky., 247 S.W.2d 384, 385 (1952). Mr. Garman had the joint brokerage account with Merrill Lynch transferred to a joint brokerage account with Hilliard Lyons, and there was no evidence that this was a mistake. While the parties may have intended to subsequently cause the assets in that account to be transferred to Mr. Garman's sole name by a relinquishment letter and stock powers, they did not do so. The trial court did not err in determining that there was a lack of clear and convincing evidence which would support a reformation of the instrument.[5]

The judgment of the Warren Circuit Court is affirmed in part as it relates to the cross-appeal by Mr. Garman's heirs, but is reversed as it relates to the appeal by Mrs. Garman's estate and is remanded for a new trial consistent with our conclusions herein.

All concur.

---

**5.** The parties stipulated that there were no factual issues to be tried concerning the counterclaim of Mr. Garman's estate. That issue was submitted by agreement to the trial court for ruling.