RENDERED: FEBRUARY 11, 2022, 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0168-MR

CASEY KUFFNER,
ADMINISTRATOR OF THE ESTATE
OF LONNIE BAKER; C.R.B., A
MINOR BY AND THROUGH HER
CO-GUARDIANS, RACHEL
KUFFNER AND CASEY KUFFNER;
AND CASEY KUFFNER,
ADMINISTRATOR OF THE ESTATE
OF JAMIE NICOLE BAKER                                    APPELLANTS


                    APPEAL FROM FAYETTE CIRCUIT COURT
v.                  HONORABLE KIMBERLY N. BUNNELL, JUDGE
                    ACTION NO. 18-CI-02286


SAINT JOSEPH HEALTH SYSTEM,
INC. D/B/A SAINT JOSEPH EAST
AND KENTUCKY ONE HEALTH,
INC.                                                      APPELLEES


                    OPINION
                    REVERSING AND REMANDING

                    ** ** ** ** **

BEFORE:  GOODWINE, K. THOMPSON, AND L. THOMPSON, JUDGES.

THOMPSON, K., JUDGE:  Casey Kuffner, Administrator of the Estate of Lonnie Baker; C.R.B., a minor by and though her co-guardians, Rachel Kuffner and Casey Kuffner; and Casey Kuffner, Administrator of the Estate of Jamie Nicole Baker (collectively the Estate), appeal from the Fayette Circuit Court's grant of summary judgment to Saint Joseph Health System, Inc. D/B/A Saint Joseph East and Kentucky One Health, Inc. (collectively St. Joseph or the hospital), resulting in its dismissal.

This is a medical malpractice case in which the physician primarily responsible for Lonnie Baker's care, Dr. Lynda Newman, has already settled with the Estate.  Additionally, all other parties except for St. Joseph were previously dismissed.  As the issue before us is the appropriateness of the circuit court granting summary judgment to St. Joseph, our focus will be on the events which are relevant to determining whether the hospital could be liable.

On June 23, 2017, Baker arrived at the St. Joseph emergency room (ER), at 6:31 p.m., complaining of chest pain and nausea.  He was treated in the ER by Dr. Newman.  At 10:15 p.m., Dr. Newman ordered chest and abdominal computed tomography (CT) scans without contrast "stat" and they were taken soon thereafter by radiologist technician Lindsey Barnes.  At around 11:00 p.m., the radiologist, Dr. Raymonda Stevens, interpreted the CT scans and found them largely unremarkable.  Baker was found unresponsive at 1:14 a.m. the next day, a

code was called on him and after extensive resuscitation efforts, Baker was pronounced dead at 2:42 a.m. A later autopsy concluded that his death was caused by an ascending aortic dissection with Marfan syndrome, a possible contributing underlying condition. The Estate filed suit for negligence in causing his death against Dr. Newman and others, including St. Joseph.

According to Dr. Newman's deposition, she decided to order the CT scan of Baker's chest because she suspected he had possible Marfan syndrome based on Baker's stature of six feet, nine inches, and knew that Marfan syndrome is associated with an elevated risk of dissection of the heart. Dr. Newman explained she ordered the CT scans without contrast because she was worried about the adverse effect the contrast dye would have on Baker's kidneys as he had an elevated creatinine level in his blood.

According to Dr. Newman's deposition testimony, she noted in the electronic order for the CT of Baker's chest that her reason for ordering the CT was "dissection," explaining this is synonymous in conjunction with a chest CT with "aortic dissection." Dr. Newman explained that she typed the word "dissection" in the electronic form order.

However, all the records associated with Baker's chart (whether generated by the ER, radiology, or the radiologist), failed to indicate this CT scan was for dissection. Instead, the orders indicated chest pain, or chest pain, nausea,

and abdominal pain.  When shown the order form in Baker's record which was apparently prepared by Dr. Newman, Dr. Newman testified that the order was not as she had prepared it, as it indicated the CT was for "cp" chest pain, which is not what she typed.

Dr. Newman testified there were a variety of ways she could get a report from radiology after the CT scans were taken and interpreted by the radiologist but noted she would have been called on the phone by the radiologist if it was urgent.  Dr. Newman recalled seeing that evening, perhaps on the radiologist's initial report on the PAX machine, that the radiologist could not evaluate for dissection, but that the radiologist did not provide an accompanying reason why such an evaluation could not be made.

Dr. Newman testified that after she received this information, she did not order a chest CT with contrast because "number one, the creatinine was too high, and number two, my suspicion [of a dissection] was too low."  Dr. Newman explained that her only suspicion for Baker having a dissection with his symptoms was his stature, and once she knew the radiologist could not look for dissection, she could have ordered a CT with contrast if she thought it was indicated.

Deposition testimony by the radiology technician, Barnes, who took Baker's CT, was that the order she received on her screen in radiology, which is an

order that only goes to radiology, gave "cp" as the reason for the exam and indicated that Baker "started having chest pains now [it's] in the belly."

Barnes testified that according to the history she took from Baker, the reason for the CT was "general chest and abdominal pain with nausea and vomiting started today." She testified that she took the CTs ordered and then electronically sent those images to radiologist Dr. Stevens.

Barnes testified she did not recall seeing anything indicating Dr. Newman wanted Baker evaluated for aortic dissection and she had no idea as to why she would not have gotten that information had Dr. Newman typed such a request into the ER system. Barnes testified that the proper test for dissection is a CT with contrast.

Dr. Kimberly Wells, the ER physician who was on duty with Dr. Newman that night, testified in her deposition that a radiology tech could change the reason given for the exam on the ordering paperwork, explaining, "I just know that in my own personal experience, sometimes the reason for the exam or the indication that I put in doesn't make it on the final read."

Dr. Stevens, the radiologist who evaluated Baker's CT scans, testified she did not recall seeing a request to evaluate Baker for an aortic dissection. Dr. Stevens explained that if she had been asked to look for a dissection she would have noted that in her report instead of chest pain, and she would have called Dr.

Newman and discussed with her that a CT with contrast had to be ordered. Dr. Stevens testified that she made no statement indicating that radiology could not assess for dissection, to be transmitted by the PAX machine or otherwise.

St. Joseph previously requested in its interrogatories to the Estate that the Estate disclose its experts and their anticipated testimony. The Estate identified three experts, Dr. Gregory Postel (a radiologist), Dr. Luca Vricella (a cardiac surgeon with a practice focusing on young adults with connective tissue disorders and aortic problems such as are experienced by those with Marfan syndrome), and Dr. Emile Bacha (a cardiac surgeon), via Kentucky Rules of Civil Procedure (CR) 26.02 disclosures. In an affidavit by the Estate's attorney, he affirmed that he reviewed the disclosures with these witnesses and they agreed with the content of the disclosures. Each of these expert witnesses were also deposed.

The disclosure for Dr. Postel states in relevant part:

Dr. Newman's request that the radiologist check for dissection, if that happened, is not found anywhere in the medical records. Under appropriate record keeping, this request should have been a matter of record. Even if this request was dropped or changed in radiology, as Dr. Wells testified may happen, there should have been some record of this. If the alleged request was dropped or changed in radiology, this would be below the standard of care.

During Dr. Postel's deposition testimony, he stated that he did not feel it was necessary to make any changes to his disclosure. He also stated that he

would not be offering any standard of care criticisms against the hospital's nurses or the hospital itself.

When Dr. Postel was asked about his disclosure statement that there would be negligence if Dr. Newman's request that the radiologist examine the CT for dissection was not passed on to the radiologist, Dr. Postel testified there was no record evidence to support Dr. Newman's claim of including that request and noted, "I have no evidence that such a record was created around that specific topic." Dr. Postel also indicated that if Dr. Newman created a record, it should be recorded unless "if somehow the electronic record system had malfunctioned" as otherwise electronic records do not disappear.

Dr. Postel clarified that if such a record, requesting an evaluation for dissection, had been created by Dr. Newman, "the radiologist would have and should have modified the order and done the examination with contrast." He further explained:

> [it would have been] the responsibility at that point of the radiologist to pick up the phone and say, hey, Dr. Newman, since you're looking for an aortic dissection, a CT scan without contrast is not a good way to look for that. I think we should give your patient contrast. And 99 times out of 100 the ordering doctor agrees, and they modify it and they go ahead and they do the exam that way.

The disclosure for Dr. Vricella states: "Assuming Dr. Newman did order the radiologist to check for dissection, this order should have been carried

out by radiology and should have been communicated to Dr. Stevens. At least Dr. Stevens could have called Dr. Newman to request a CTA or CT with contrast."

Dr. Vricella affirmed his CR 26.02 disclosure during his deposition. Dr. Vricella denied that he would offer any criticisms at trial against the nurses or the hospital itself.

Dr. Vricella opined that a CT with contrast was necessary here, and if the dissection was properly diagnosed, surgery in a case like Baker given his age and condition would have a 10-15% mortality rate. Dr. Vricella further opined that given the elevated level of creatinine, Baker should have been hydrated, and given the CT with contrast to rule out the one condition that could kill him; his kidneys would get better after surgery more likely than not "[a]nd even if he ends up on dialysis, his outcome is pretty good. But if you don't do it, you know what happens because you see it in this case. You have 100% mortality."

Dr. Vricella opined that even with transferring Baker to a different hospital, he could have been on the operating table within one hour of the dissection diagnosis and "within 20 minutes [of beginning the operation] you should be on cardiac only bypass which means at that point you have control of the patient. If he ruptures at that point or has a contained rupture, you can manage." Dr. Vricella further opined that had someone of Baker's age and condition received

the surgery before a rupture, he would have an 80% chance of being alive three to five years later if he survived the operation.

The disclosure for Dr. Bacha states:

> If Dr. Newman . . . did order the radiologist to try to assess for dissection, this should have been done, even though difficult to be done with no contrast. At least the radiologist could have called Dr. Newman and explained that contrast was necessary. . . . The failure, if there was one, to communicate the request is below the standard of care for a radiology department.

During Dr. Bacha's deposition, he affirmed his CR 26.02 disclosure. Dr. Bacha also denied that he would be offering any criticism at trial against the hospital.

When asked more about his disclosure statements relating to Dr. Newman which noted that she specified the CT was to check for dissection, Dr. Bacha agreed that he discounted Dr. Newman's testimony on this point. Dr. Bacha clarified that the statement in his disclosure that if Dr. Newman indeed asked the radiologist to look for dissection and that was not communicated, it was below the standard of care, meant "that Dr. Newman should have specified what she was looking for" and if she did so, Dr. Bacha would be critical of the radiologist for failing to look for dissection.

Dr. Bacha testified that had the correct CT with contrast test been done on Baker in a timely fashion, "he would have been diagnosed with an aortic

dissection at the time when he was hemodynamically stable . . . would have been transferred, thereto, to the appropriate facility to be treated . . . [and] would have had an excellent result[.]" Dr. Bacha also testified that operating on Baker before rupture would be urgent but have good survivability.

St. Joseph filed a motion for summary judgment, arguing that the allegation "that the hospital potentially failed to document or communicate a CT scan order" was insufficient to establish causation against the hospital because none of the Estate's experts attributed Baker's injuries or death to any alleged breach of the standard of care by the hospital. St. Joseph further argued that even if Dr. Newman included the word "dissection" in the CT order and then the hospital negligently failed to communicate this to the reviewing radiologist, it did not matter because Dr. Newman further testified that she received a report from Dr. Stevens advising that Dr. Stevens could not evaluate Baker's chest CT for dissection; Dr. Newman knew she had the option to order a CT with contrast but chose not to order it because Baker's creatinine level was elevated and her suspicion for aortic dissection was low. St. Joseph relied upon deposition testimony by the Estate's expert witnesses that they had no criticism of the hospital and did not testify that any alleged or "contingent" breach of the standard of care by the hospital resulted in harm to Baker, as precluding liability by the hospital.

-10-

St. Joseph argued summary judgment should be granted as there were no

remaining issues of material fact to submit to a jury.

In responding to St. Joseph's motion for summary judgment, the

Estate explained its argument as follows:

> It is without dispute that Dr. Newman testified she
> ordered the radiologist to assess for dissection and Dr.
> Stevens testified she never received the order.
>
> There is a clear inference in this case the hospital
> radiology department failed to carry out a physician's
> order. Perhaps the computer system from ER to
> radiology to Dr. Stevens was defective and/or not
> properly programmed. Perhaps Ms. Barnes saw
> "dissection," but thinking it could not be carried out
> without the use of contrast, changed the order.

In support of this later supposition, the Estate pointed to deposition testimony by

Dr. Wells that a radiology tech could change the reason given for the exam,

attributing such an action to the hospital. The Estate then opined, "[t]he radiology

department's failure to carry out Dr. Newman's order was clearly a substantial

factor in [Baker's] death."

The Estate interpreted its expert witnesses' CR 26.02 disclosures as

collectively being that if Dr. Newman requested a CT to look for dissection and

this request was never sent by St. Joseph's radiology department to Dr. Stevens,

this would be negligence by the hospital. The Estate explained that while St.

Joseph asked if the hospital was negligent, and the experts opined that it was not,

-11-

the Estate argued that St. Joseph avoided asking if the hospital was negligent if Dr. Newman's request to look for dissection was not communicated to Dr. Stevens, and St. Joseph's failure to ask such a question in its examination of these experts means its CR 26.02 disclosures are controlling as to the experts' opinions of this matter. The Estate explained that "[c]ounsel cannot refuse to ask the correct questions and then argue the expert had no opinion." The Estate further explained that the disclosures were properly part of the record that could be considered in resolving the summary judgment motion as they were provided as part of answers to interrogatories, with counsel's affidavit indicating the experts approved these disclosures before they were filed.

During argument, the circuit court heard argument as to whether the CR 26.02 disclosures could properly be considered in deciding whether summary judgment was proper. St. Joseph argued the disclosures were no longer relevant after the experts were deposed and argued the experts' deposition testimony was inconsistent with the disclosures so far as the experts denied the hospital was negligent, and should therefore be rejected, relying on an unpublished decision which commented:

> If a deposition is more reliable than an affidavit, certainly it is far more reliable that an unsworn medical report. Consequently, an earlier unsworn medical report that contradicts later deposition testimony cannot be submitted for the purpose of attempting to create a

> genuine issue of material fact to defeat a properly
> supported summary judgment motion.

*Cooper v. Nair*, No. 2019-CA-000094-MR, 2020 WL 5268065, at *4 (Ky.App. Sep. 4, 2020) (unpublished).  The Estate argued that *Cooper* did not support rejecting the expert witnesses' disclosures, which were not inconsistent with their deposition testimony, where the right questions were not asked as to whether the hospital was negligent if Dr. Newman was believed that she requested the radiologist check for "dissection" and the hospital prevented this communication from taking place.  The circuit court for purposes of its ruling assumed that it could properly consider the contents of the disclosures.

In argument the question came down to whether, assuming the facts most favorable to the Estate that Dr. Newman in fact communicated her desire for the radiologist to check for dissection and the hospital was negligent in not seeing that done (either through the radiology technician changing the order, or some kind of computer glitch preventing the order from being properly transmitted), whether causation for Baker's death could be attributed to this negligence.

The Estate argued that causation was established as if Dr. Stevens had seen Dr. Newman's note to check for dissection, Dr. Stevens would have called Dr. Newman to discuss the correct test and relative risks to the kidneys compared to the risk of not doing anything, which would have caused Dr. Newman to change her mind and order the correct test, thus ensuring a correct diagnosis and

appropriate, timely surgical repair. St. Joseph argued that Dr. Newman's mind would not have been changed by a phone call because regardless of any potential negligence by the hospital in failing to communicate Dr. Newman's note about dissection, Dr. Newman *did* receive word that dissection could not be evaluated through the CT she ordered, she believed the risk of dissection to be low, and she chose not to order the correct test, despite being given an opportunity to do so, meaning that her actions alone caused Baker's death.

In evaluating these arguments, the circuit court opined from the bench that it had to consider *all* of Dr. Newman's deposition testimony and could not piecemeal it in a way to be favorable to the Estate. The circuit court then opined that based upon Dr. Newman's failure to order the correct test once she knew dissection could not be screened for by a CT without contrast, the Estate failed to establish causation and, therefore, there was no breach of the standard of care. The particular reasons behind the circuit court granting St. Joseph's motion for summary judgment were not provided in the written order.

"[T]he granting of a summary judgment is a drastic remedy[.]" *Conley v. Hall*, 395 S.W.2d 575, 582 (Ky. 1965). Pursuant to CR 56.03, summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if

-14-

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

"The standard of review on appeal of a summary judgment is whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky.App. 1996). Summary judgment "should only be used 'to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant.'" *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 483 (Ky. 1991) (quoting *Paintsville Hospital Co. v. Rose*, 683 S.W.2d 255, 256 (Ky. 1985)). Summary judgment should not be granted "unless the right to summary judgment is shown with such clarity that there is no room left for controversy." *Commonwealth v. Whitworth*, 74 S.W.3d 695, 698 (Ky. 2002).

In reviewing the grant of summary judgment, courts should "resolv[e] all favorable inferences which could reasonably be drawn from the evidence, in favor of the appellant." *Hammond v. Heritage Communications, Inc.*, 756 S.W.2d 152, 154 (Ky.App. 1988).

Initially, we consider whether the CR 26.02 expert disclosures could properly be considered to establish an issue of material fact. The Estate is correct

that such disclosures can properly be considered on summary judgment when these disclosures are made pursuant to responses to interrogatories under CR 26.02(4)(a)(i), as CR 56.03 specifically allows consideration of "answers to interrogatories" to resolve whether there is a "genuine issue as to any material fact[.]"

While the disclosures themselves would not be admissible at trial as evidence, when determining whether summary judgment has been properly granted we are not concerned with either "the *competency* of evidence" or "the *sufficiency* of the evidence." *Conley*, 395 S.W.2d at 578. In reviewing the grant of summary judgment, the only question is whether the circuit court properly determined there was no genuine issue of material fact. *Scifres*, 916 S.W.2d at 781.

We reject St. Joseph's argument that the experts' deposition testimony contradicted their disclosures and, thus, makes the disclosures insufficient to establish factual questions on causation. While we do not agree that causation is as clear-cut as the Estate seems to believe, we do believe that when considering the evidence as a whole, along with reasonable inferences to be given to it, that if Dr. Newman's testimony was believed that she marked "dissection" and Dr. Stevens's testimony is believed that she did not receive this information, the implication is that the hospital was negligent in failing to communicate this information between these two physicians. While the exact mechanism responsible for preventing

-16-

adequate communication between the ER doctor and the radiologist is unclear, the experts were clear that if Dr. Newman were to be believed in her testimony that she requested an evaluation for dissection, this information should have made it to Dr. Stevens. As the hospital is liable for the radiologist technician's actions and its electronic records system, a reasonable inference could be that the failure to have Dr. Newman's specific request reach Dr. Stevens must be attributable to hospital negligence. However, if the experts disbelieved Dr. Newman on this, which they all seemed to do to different extents, their general statements about not criticizing the hospital naturally follow from that.

We agree with the Estate that the Estate's experts were clear in their opinions that if the information had made it to Dr. Stevens, Dr. Stevens would have been under a duty to call Dr. Newman and explain the correct type of CT which should be given. Dr. Stevens also specifically testified that if she had known Dr. Newman wanted Baker evaluated for dissection, she would have called Dr. Newman and had that discussion with her. Furthermore, Dr. Bacha specifically testified that ninety-nine times out of one hundred, a phone call of this nature would have been successful in getting the doctor to order the correct test.

St. Joseph focuses on the fact that Dr. Newman testified she believed she had received a communication from Dr. Stevens via the PAX machine that Baker could not be evaluated for dissection and the circuit court's statement that all

of Dr. Newman's testimony needed to be considered, in opining that causation for Baker's injury was attributable to Dr. Newman alone, because any failure to communicate about "dissection" in the order would not have changed the outcome.

We disagree with the circuit court that to survive summary judgment Dr. Newman's testimony must all be believed. If the case went to a jury, the jury as the finder of fact would have "the right to believe part of the evidence and disbelieve other parts, even if the evidence came from the same witness[.]" *Sroka-Calvert v. Watkins*, 971 S.W.2d 823, 828 (Ky.App. 1998). The same should be true on summary judgment.

As St. Joseph has tried to imply that because Dr. Newman requested testing for dissection on another patient she may have been mistaken that she requested evaluation for dissection on Baker, Dr. Newman could similarly be mistaken that any information she received from radiology about being unable to evaluate for dissection related to Baker. A jury could certainly believe Dr. Stevens that she made no such communication to Dr. Newman and disbelieve Dr. Newman on this point, which is distinct from what Dr. Newman placed in the order for Baker's chest CT.

But even if Dr. Newman were to be believed about what written communication she received via the PAX machine about the radiologist being unable to evaluate Baker for dissection, that does not mean that a phone call and

interactive communication with Dr. Stevens would have the same result as a written statement which did not offer any advice as to what Dr. Newman should do. Dr. Postel's testimony about the likelihood of a radiologist's phone call resulting in the ordering doctor changing the order to an appropriate test, along with Dr. Stevens's testimony that she would have called Dr. Newman about ordering the correct test if informed as to the correct reason why the CT was ordered, certainly provides a basis for a jury to infer that appropriate communication would have resulted in the correct diagnosis and timely, lifesaving surgery.

While it may not be likely that a jury would believe Dr. Newman over hospital records as to what she requested for Baker, on summary judgment courts are not to weigh the evidence and decide factual issues. We believe an appropriate causal link can be made that the hospital's failure to communicate the necessary information was the ultimate cause of Baker's death, for Dr. Newman's initial error in ordering the wrong kind of CT scan, would not have caused Baker harm if it could have been promptly corrected via consultation with the radiologist.

Accordingly, we reverse and remand the Fayette Circuit Court's grant of summary judgment to St. Joseph.

THOMPSON, L., JUDGE, CONCURS.

GOODWINE, JUDGE, CONCURS IN RESULT ONLY.

BRIEFS FOR APPELLANT:

Cory Michael Erdmann
Richmond, Kentucky

Joe C. Savage
Lexington, Kentucky

BRIEF FOR APPELLEE:

Jeffery T. Barnett
Kimberly G. DeSimone
Lexington, Kentucky